IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

DRED COLEMAN,

                Petitioner,                        Case No. 2:12-CV-1213
                                                    Judge Marbley
        v.                                      Magistrate Judge King

WARDEN, TRUMBULL CORRECTIONAL
INSTITUTION,

                Respondent.

<u>REPORT AND RECOMMENDATION</u>

      This is an action for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. This matter is before the Court on the *Petition*, Doc. No. 1, Respondent's *Return of Writ*, Doc. No. 5, Petitioner's *Traverse,* Doc. No. 7, and the exhibits of the parties. For the reasons that follow, the Magistrate Judge **RECOMMENDS** that this action be **DISMISSED.**

      Petitioner's renewed request for the appointment of counsel (*see Traverse*) is **DENIED.**

I.    <u>Relevant Procedural History</u>

      This case involves Petitioner's convictions, following a jury trial, on charges resulting from the murder of Darryl Wood. After the joinder of indictments against Petitioner,

> the cases came for trial before a jury beginning October 28, 2009. At trial, the state presented evidence that Darryl Wood ("Wood"), Rudolph Lynch, and Keith James were each indicted on drug charges in Franklin County in June of 2008. Those three individuals appeared in Franklin County Common Pleas Court on December 8, 2008, at which time the prosecutor "made Keith James' attorney aware that Darryl [Wood] intended to cooperate against the two co-defendants." (Tr. 470.) The case was then continued because of Wood's

1

indication of cooperation. On December 9, 2008, Wood was shot and killed at his residence on 2320 Argyle Drive, Columbus. Appellant, the nephew of Rudolph Lynch, and another individual, Ramon Blevins, were arrested shortly after the shooting. Blevins entered a guilty plea to a charge of murder, with a firearm specification, in connection with the shooting death of Wood, and is currently serving a sentence of 18 years to life at the Ross Correctional Institute.

Blevins, age 25, testified on behalf of the state at appellant's trial, and gave the following testimony. Blevins, an acquaintance of appellant, is a resident of Cleveland. Blevins first met Lynch at appellant's residence in early December of 2008. On Friday, December 5, 2008, the three men got into a van driven by Lynch and traveled from Cleveland to Columbus, where they rented a room at a Motel 6 on Brice Road; Lynch paid for the room.

On the morning of Monday, December 8, the three men drove to Wood's neighborhood and parked several houses away from his residence. Lynch watched Wood's house from the van; Blevins believed they were watching the house "[f]or a burglary to occur." (Tr. 498.) Lynch told Blevins that Wood usually went to work in the morning, but Wood did not leave for work on this particular date. After approximately one hour, Lynch drove appellant and Blevins back to the motel.

The next morning, December 9, the three men returned to Wood's neighborhood and sat in the van near his home. They watched Wood and his wife leave their residence that morning. Blevins and appellant then went to the rear of the house, while Lynch remained outside. Blevins was wearing a gray hoodie, a tan coat, white tennis shoes, blue jeans, gloves, and a mask. Appellant was wearing a gray hoodie, gloves, dark pants, and black tennis shoes with white soles. Blevins jimmied the back door and they entered the residence. Blevins began searching the house for marijuana. He went to the basement and tossed two items to the floor, not realizing they were bales of marijuana. Blevins then went upstairs to tell appellant he could not find anything.

2

At about that time, Wood returned to his residence, and appellant and Blevins ran downstairs and hid in a laundry area. Blevins heard two voices upstairs. Wood started to come downstairs, but he noticed appellant. Wood asked appellant what he was doing there, and Wood then ran upstairs and yelled to someone "[g]et my gun." (Tr. 516.) Appellant went up the stairs directly behind Wood. Blevins began running up the stairs, but, halfway up the stairway, he heard a couple of gunshots from the front yard. He went outside and saw Wood lying on the ground. During the shooting incident, Blevins heard Wood pleading: "Don't kill me." (Tr. 549.) Blevins had earlier observed a .357 revolver in the van in a box.

Appellant started running across the backyard, and Blevins followed after him and jumped over a fence. (Tr. 518.) A short time later, Blevins threw his tan coat, gloves, and mask into a trash can. Appellant gave Blevins his gloves, and Blevins also threw those into a trash can. Blevins observed the revolver in appellant's hand, and appellant threw the weapon into a nearby sewer. (Tr. 525.)

At the time the shots were fired, several neighbors called 911, and police officers soon arrived and were given a description of "a couple of suspicious male blacks" in a backyard residence. (Tr. 103.) One officer observed the two suspects and gave chase on foot. Appellant was arrested after a brief foot chase. Blevins hid underneath a van, but was soon discovered by police officers and arrested.

Later that evening, Blevins and appellant were released from police custody. They went to a nearby restaurant, and appellant called his uncle. Lynch arrived a short time later, but when appellant and Blevins went to the parking lot, Lynch was gone. Blevins and appellant then boarded a COTA bus; after a few stops, Lynch got on the same bus and handed appellant some clothes.

Blevins and appellant eventually got off the bus and began walking toward Brice Road. They returned to the Motel 6, but were informed that their room was no longer rented. Appellant phoned his brother and arranged to have money sent by

wire to pay for bus fare for Blevins and appellant to return to Cleveland. At the Motel 6, appellant told Blevins that Wood "was supposed to testify against his uncle." (Tr. 543-44.) The two men began walking toward a nearby store, but they were again taken into custody by police officers who had been following them. At trial, Blevins denied firing the shots that killed Wood.

Ronald Jones, the uncle of Wood, had accompanied his nephew to the Franklin County Courthouse on the morning of December 8, 2008. At that time, an individual named Keith James "made threatening statements to my nephew." (Tr. 335.) Jones was at Wood's residence on the date of the shooting, and gave the following testimony of the events that day. On the morning of December 9, Wood drove to Jones' residence and picked up his uncle at approximately 8:30 a.m. Wood drove to a nearby gas station, but after receiving a telephone call from "Butch," a friend, Wood drove back to his residence. (Tr. 284.) Butch arrived at Wood's residence in a green pickup truck, and the three men then went inside the house.

Jones began watching television in the living room, while Wood and Butch went into the kitchen area. Wood walked toward his bedroom, but then returned to the kitchen. Wood then stated, "[s]omeone is in my house, they have a gun, get out." (Tr. 289.) Jones heard a gunshot and exited the house through the front door. Jones went to the next-door neighbor's house and knelt behind an SUV. Jones heard at least four or five gunshots. Jones also heard his nephew fall down and yell out: "No, man, no." (Tr. 291.) Jones saw Wood on the ground and his body shaking. Jones observed someone wearing white tennis shoes "walk up on him." (Tr. 292.) He heard two more shots after seeing the individual approach his nephew. Jones then observed two men running away. One of the individuals ran toward Meredith Avenue. Jones was unable to see the faces of these individuals, but he observed that they were both black males.

Charles "Butch" Martin, age 43, a high school acquaintance of Wood, was also at Wood's residence on the date of the shooting. Martin testified that he drove to Wood's house on December 9, shortly before 9:00 a.m. Wood's uncle was at the residence when he arrived. While standing in the kitchen, Martin heard Wood scream

out: "Uncle Ron, get the gun, there is somebody in the house." (Tr. 357.) Martin ran toward the back door, attempting to unlock it. The screen door was locked, so Martin threw himself against the screen and knocked the screen out. Martin ran toward a hill in the backyard and heard five shots. He then heard three more shots, and as he jumped over a fence he heard two more shots. Martin asked a neighbor to call 911.

At the scene of the shooting, police officers recovered several bales of marijuana from Wood's residence. Police officers found a firearm in a sewer near Bethesda Avenue and Elton Road. Officers also found a coat, a pair of brown gloves, and a mask while searching a trash can.

Dr. Tae Lyong An, a deputy coroner with the Franklin County Coroner's Office, conducted an autopsy on Wood. Dr. An noted five entry wounds and two exit wounds on the body. The entry wounds were to the victim's left front chest, the back of the head, the right upper back, the left mid-back area near the spine, and the right forearm. The bullet wound to the chest lacerated the left lung, while the wound to the head lacerated the victim's brain. Dr. An opined that the cause of death was the "multiple gunshot wounds, laceration multiple internal organs." (Tr. 456.)

Mark Hardy, a forensic scientist with the Columbus Police Department, opined that five bullets retrieved from the victim following the autopsy had been fired from the .357 Smith & Wesson revolver recovered from the sewer. (Tr. 739.) A forensic scientist testified that swabs taken from the hands of Blevins and appellant both tested positive for gunshot residue.

Andre Brown, age 20, is currently incarcerated for murder. In November of 2008, Brown was incarcerated in the Franklin County Jail, where he met appellant. Brown watched a newscast involving the shooting of Wood. Brown told appellant that he knew a girl who lived near the house where the shooting occurred. Appellant wanted to know the name of the girl "to use the girl [Brown knew] as an alibi." (Tr. 634.) Appellant told Brown that he had already told a detective that a girl was his alibi. According to Brown, appellant was worried his co-defendant would "tell on him." (Tr. 638.) Appellant told

Brown that he and his co-defendant "had came down here for his uncle, he had paid him to kill a dude so he wouldn't testify on him the next day or something, and he basically told me what happened." (Tr. 639.) Appellant said that "they came in a cab, jumped out of the car, he seen him, he shot him, he ran, and threw the gun in the backyard." (Tr. 639.) Appellant also told Brown he was worried "there was some gunpowder on his hoodie. He didn't know if it would be on there or not." (Tr. 642.) Following this conversation, Brown contacted Ann Pennington, the lead police detective in the case involving Wood.

Robert Mason, age 42, is currently incarcerated, and was previously held in the Franklin County Jail in December 2008, where he met appellant. Appellant asked Mason "about gunshot residue on a jacket and if I thought that it would be able to be detected in a test, and I said yes, I thought that it would." (Tr. 661.) Later, Mason told appellant about someone who owed him money. Appellant "said to me that he could have that taken care of." (Tr. 662.) According to Mason, appellant stated during this conversation that he "would just put two or three in the MF'er like I did down here." (Tr. 662.) Later, appellant told Mason he was worried about information he had given to Brown "about the murder." (Tr. 663.)

Columbus Police Detective Ann Pennington, the lead homicide detective on the case, testified that Brown had contacted her on December 12, 2008, stating he had information. Brown told the detective that appellant related he and Blevins had shot and killed Wood because he was going to testify against appellant's uncle. Brown told Pennington that appellant wanted Brown to find a girl to play the part of "Pebbles" for him as an alibi. Pennington testified that Tamara Lynch, the wife of Rudolph Lynch, had rented a van around the time of the shooting, and that the van had been returned on the afternoon of December 9.

Appellant testified on his own behalf, and gave the following account. On December 5, 2008, appellant and his uncle went to Cleveland to pick up Blevins. They drove to Columbus, and appellant and Blevins stayed at a Motel 6 near Brice Road. On December 9, Lynch picked up appellant and Blevins and drove to a residence; Lynch stated that there were "many pounds of marijuana in this

house." (Tr. 1096.) Blevins was ready to enter the house, but appellant was reluctant and would not go inside without a mask. Lynch told appellant to get out of the van, so appellant began to walk through the neighborhood in the direction they had come from. Approximately eight minutes later, Blevins came running toward him, out of breath. Blevins told him to call his uncle. While walking through a backyard, appellant saw a police officer approach them, and appellant began running, jumping over a fence. Appellant eventually surrendered to the police.

Appellant denied ever entering the house or being in the backyard of Wood's residence. According to appellant, he was three streets from the residence when he thought he heard gunshots. When questioned by detectives, appellant told them he was in the area looking for a girl named "Pebbles." (Tr. 1104.) He acknowledged at trial that there was no girl named Pebbles.

Following deliberations, the jury returned verdicts finding appellant guilty on all counts. In case No. 09CR-1055, the trial court merged the aggravated murder counts and sentenced appellant on Count 2. The court imposed a sentence of life without parole on the aggravated murder count, plus an additional three-year term for the firearm specification, and the court imposed a sentence of ten years on the aggravated burglary charge, with an additional three years for the firearm specification. The trial court ordered the sentences to run consecutive each other and consecutive to case No. 08CR-8790. In case No. 08CR-8790, the trial court imposed a sentence of five years of incarceration on the count of having a weapon under disability, to run concurrent to a one-year term (with a one-year firearm specification) on the count of tampering with evidence.

*State v. Coleman*, No. 10AP-265, 10AP-266, 2011 WL 1483891, at *1-5 (Ohio App. 10th Dist. April 19, 2011).

On direct appeal, Petitioner raised the following assignments of error:

I. THE TRIAL COURT ERRED AND DEPRIVED APPELLANT
OF DUE PROCESS OF LAW AS GUARANTEED BY THE
FOURTEENTH AMENDMENT TO THE UNITED STATES
CONSTITUTION AND ARTICLE ONE SECTION TEN OF THE
OHIO CONSTITUTION BY FINDING HIM GUILTY OF
AGGRAVATED MURDER, BURGLARY AND TAMPERING WITH
EVIDENCE AS THOSE VERDICTS WERE NOT SUPPORTED BY
SUFFICIENT EVIDENCE AND WERE ALSO AGAINST THE
MANIFEST WEIGHT OF THE EVIDENCE.

II. APPELLANT WAS DEPRIVED OF HIS RIGHT TO BE
PRESENT AND TO THE PRESENCE AND ASSISTANCE OF HIS
COUNSEL DURING A CRITICAL STAGE OF HIS JURY
TRIAL, AND HIS RIGHT TO DUE PROCESS AND A
FUNDAMENTALLY FAIR JURY TRIAL AS REQUIRED BY THE
FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE
UNITED STATES CONSTITUTION AND ARTICLE ONE
SECTIONS FIVE, TEN AND SIXTEEN OF THE OHIO
CONSTITUTION AND CRIMINAL RULE 43(A).

III. THE TRIAL COURT ERRED BY IMPOSING
CONSECUTIVE SENTENCES WITHOUT MAKING THE
REQUISITE FACTUAL FINDINGS; THEREBY DEPRIVING
APPELLANT OF DUE PROCESS OF LAW AS GUARANTEED BY
THE FOURTEENTH AMENDMENT TO THE UNITED STATES
CONSTITUTION AND ARTICLE ONE SECTION SIXTEEN OF
THE OHIO CONSTITUTION.

*Exhibit 24* to *Return of Writ*, PAGEID # 128. On April 19, 2011, the

state appellate court affirmed the judgment of the trial court. *State

v. Coleman*, 2011 WL 1483891, *5. Petitioner did not pursue a timely

appeal from that decision; however, on September 21, 201, the Ohio

Supreme Court granted Petitioner's motion for a delayed appeal. *State

v. Coleman*, 129 Ohio St.3d 1473 (2011). On December 21, 2011, the Ohio

Supreme Court dismissed the appeal. *State v. Coleman*, 130 Ohio St.3d

1494 (2011).

On December 26, 2012, Petitioner filed the *Petition*, alleging that

he is in the custody of the Respondent in violation of the Constitution

of the United States based on the following grounds:

1. The trial court erred and deprived appellant
   of due process of law when his convictions are

not supported by sufficient evidence and were against the manifest weight of the evidence.

2. Appellant was deprived of his right to be present and to the presence and assistance of counsel during a critical stage of his jury trial violating his right to due process and a fundamentally fair trial.

3. The trial court erred by imposing consecutive sentences without making the requisite factual findings.

Respondent contends that Petitioner's claims are procedurally defaulted or without merit.

## II.  Manifest Weight of the Evidence

In claim one, Petitioner asserts that his convictions are against the manifest weight of the evidence.  This claim fails to present an issue appropriate for federal habeas corpus review.  The Due Process Clause offers no relief for defendants whose convictions are against the manifest weight of the evidence, but only for those who have been convicted without sufficient evidence to permit a rational trier of fact to find guilt beyond a reasonable doubt. *Walker v. Engle*, 703 F.2d 959, 969 (6th Cir. 1983).

A petitioner alleging that a conviction is not supported by the "sufficiency of the evidence" alleges a violation of the due process requirement that there be sufficient evidence introduced in favor of the prosecution to permit a rational trier of fact to find each element of a crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  When reviewing a sufficiency of the evidence claim, a federal habeas court must defer to the trier of fact with respect to issues of conflicting testimony, weight of the

evidence, and the credibility of the witnesses. *Id.* at 319; *Walker*, 703 F.2d at 969.  On the other hand, under Ohio law, a claim that a verdict was against the manifest weight of the evidence – as opposed to one based upon insufficient evidence – requires the state appellate court to act as a "thirteenth juror" and review the entire record, weigh the evidence, and consider the credibility of witnesses to determine whether "the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Martin*, 20 Ohio App.3d 172, 175 (1983); *cf. Tibbs v. Florida*, 457 U.S. 31 (1982).  Because a federal habeas court does not function as an additional state appellate court, vested with the authority to conduct such an exhaustive review, any claim that Petitioner's convictions were against the manifest weight of the evidence cannot be considered by this Court.

**III.  Insufficiency of the Evidence**

In claim one, Petitioner also alleges that the evidence was constitutionally insufficient to sustain his convictions.  As it relates to all of Petitioner's convictions except his conviction on the aggravated murder charge, the claim has been procedurally defaulted and this Court cannot, therefore, consider the merits of that claim to that extent. Moreover, even as the claim relates to Petitioner's aggravated murder conviction, the Court concludes that the claim lacks merit. The state court's decision rejecting this claim was not contrary to or an unreasonable application of clearly established federal law, nor was it based on an unreasonable

determination of the facts in light of the evidence presented in the state court.

### A. Sufficiency of the Evidence Supporting Convictions for Burglary, Tampering With Evidence, and Possessing a Weapon while under a Disability

Petitioner also alleges in claim one that the evidence was constitutionally insufficient to sustain his convictions, including his convictions for aggravated murder, burglary, tampering with evidence, and having a weapon while under a disability. Petitioner, however, waived this claim with regard to all his convictions, except aggravated murder, because he failed to raise this claim on direct appeal. He is therefore barred by procedural default with regard to these convictions.

In recognition of the equal obligation of the state courts to protect the constitutional rights of criminal defendants, and in order to prevent needless friction between the state and federal courts, a state criminal defendant with federal constitutional claims is required fairly to present those claims to the highest court of the state for consideration. 28 U.S.C. § 2254(b), (c). If he fails to do so, but still has an avenue open to him to present those claims, his petition is subject to dismissal for failure to exhaust state remedies. *Id.; Anderson v. Harless*, 459 U.S. 4, 6 (1982) (*per curiam*); *Picard v. Connor*, 404 U.S. 270, 275-76 (1971). If he can no longer present his claims to a state court because of a state procedural rule, he has waived them for federal habeas review unless he can demonstrate cause for the procedural default and actual prejudice resulting from the alleged constitutional error. *Murray v.*

*Carrier*, 477 U.S. 478, 485 397 (1986); *Engle v. Isaac*, 456 U.S. 107, 129 (1982); *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).

The Sixth Circuit uses the four-part *Maupin* test to determine whether a federal habeas claim is precluded due to the Petitioner's failure to observe a state procedural rule: "First, the court must determine that there is a state procedural rule that is applicable to the Petitioner's claim and that the petitioner failed to comply with the rule." *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986). Second, the Court must determine whether the state courts actually enforced the state procedural sanction. *Id*. Third, the Court must determine whether the state procedural forfeiture is an 'adequate and independent' state ground on which the state can rely to foreclose review of a federal constitutional claim. *Id*. Finally, if the Court determines that the petitioner failed to comply with an adequate and independent state procedural rule, Petitioner must demonstrate cause for his failure to follow the State's procedural rule as well as actual prejudice from the alleged constitutional error. *Id*.

Petitioner's claim that the evidence was constitutionally insufficient to sustain his convictions on burglary, tampering with the evidence, and having a weapon while under a disability has been waived because, being readily apparent from the face of the record, that claim should have been raised on direct appeal, but was not. Although Petitioner indicated in his appellate brief that he intended to challenge his convictions for "aggravated murder, burglary and tampering with evidence," on this basis, *see Exhibit 24* to *Return of Writ*, PAGEID # 128, he actually presented argument on this basis only

in connection with his aggravated murder conviction. *See Exhibit 24* to *Return of Writ,* PAGEID # 135-36. The state appellate court addressed only this claim on appeal.

> At the outset, we note that while appellant's statement of assignment of error lists each of his convictions (i.e., aggravated murder, aggravated burglary, tampering with evidence, and having a weapon under disability),[1] the argument set forth in the body of the first assignment of error only addresses the sufficiency and manifest weight of the evidence regarding his conviction for aggravated murder. Specifically, appellant argues that the element of prior calculation and design was lacking because Blevins testified that the intent of the burglary of Wood's home was to steal drugs and money, not to kill Wood. According to appellant, the testimony of Blevins indicates that appellant and Blevins entered the house and began searching for drugs, and that the return of Wood appeared to be a surprise; further, that appellant only began shooting at Wood after Wood confronted him in the basement. Appellant notes that another of the state's witnesses, Jones, observed an individual with white tennis shoes standing over his nephew, while the evidence indicates appellant was wearing black tennis shoes at the time of the incident.

*State v. Coleman*, 2011 WL 1483891, at *7.

Petitioner can now no longer raise this claim in connection with his other convictions in the state courts by operation of Ohio's doctrine of *res judicata. See State v. Cole*, 2 Ohio St.3d (1982); *State v. Ishmail*, 67 Ohio St.2d 16, 423 N.E.2d 1068, (1981); *State v. Perry*, 10 Ohio St.2d 175, 226 N.E.2d 104, (1967) (claims must be raised on direct appeal, if possible, or they will be barred by the

---

[1] Petitioner's appellate brief actually did not include in this claim his conviction on having a weapon while under a disability. *See Exhibit 24* to *Return of Writ*, PAGEID # 128.

doctrine of *res judicata*). Although Petitioner attempted to raise his claim of insufficiency of the evidence as to all of his convictions on appeal to the Ohio Supreme Court, he did not thereby preserve the claim for federal habeas corpus review, because the Ohio Supreme Court does not ordinarily consider claims not raised in the appellate court below. *See State v. Jester,* 32 Ohio St.3d 147, 154 (1987); *see also Normand v. McAninch*, 2000 WL 377348, *5 (6th Cir. April 6, 2000) (this rule serves the state's interest in the regularity of criminal convictions and does not implicate federal law). The state courts were never given an opportunity to enforce this procedural rule due to the nature of Petitioner's procedural default. This Court therefore deems the first and second parts of the *Maupin* test to have been met.

The Court must next decide whether the procedural rule at issue constitutes an adequate and independent ground that forecloses review of the petitioner's federal constitutional claims. To be "independent," the procedural rule at issue, as well as the state court's reliance thereon, must rely in no part on federal law. *See Coleman v. Thompson*, 501 U.S. 722, 732-33 (1991). To be "adequate," the state procedural rule must be firmly established and regularly followed by the state courts. *Ford v. Georgia*, 498 U.S. 411 (1991). "[O]nly a 'firmly established and regularly followed state practice' may be interposed by a State to prevent subsequent review by this Court of a federal constitutional claim." *Id*. at 423 (quoting *James v. Kentucky,* 466 U.S. 341, 348-351 (1984)); *see also Barr v. City of Columbia*, 378 U.S. 146, 149 (1964); *NAACP v. Alabama ex rel. Flowers*, 377 U.S. 288, 297 (1964); *see also Jamison v. Collins*, 100 F.Supp.2d

521, 561 (S.D. Ohio 1998).  This Court must also balance the state's interests behind each procedural rule against the federal interest in reviewing federal claims. *See Maupin*, 785 F.2d at 138.

The Sixth Circuit has consistently held that Ohio's doctrine of *res judicata, i.e.*, the *Perry* rule, is an adequate ground for denying federal habeas relief. *Lundgren v. Mitchell*, 440 F.3d 754, 765 (6th Cir. 2006); *Coleman v. Mitchell*, 268 F.3d 417, 427-29 (6th Cir. 2001); *Seymour v. Walker*, 224 F.3d 542, 555 (6th Cir. 2000); *Byrd v. Collins*, 209 F.3d 486, 521-22 (6th Cir. 2000); *Norris v. Schotten*, 146 F.3d 314, 332 (6th Cir. 1998).  Ohio's doctrine of *res judicata* does not rely upon or otherwise implicate federal law.  In addition, the doctrine of *res judicata* is stated in unmistakable terms in countless Ohio decisions, and Ohio courts have consistently refused, in reliance on that doctrine, to review the merits of claims. *State v. Cole,* 2 Ohio St.3d at 112; *State v. Ishmail*, 67 Ohio St.2d at 16.  Further, the doctrine of *res judicata* serves the state's interest in finality and in ensuring that claims are adjudicated at the earliest possible opportunity.  The third pong of the *Maupin* test is therefore met.

Under the fourth prong of the *Maupin* test, Petitioner may still obtain review of the merits of these claims if he establishes cause for his procedural default as well as actual prejudice from the alleged constitutional violations.  In this context, " '[c]ause' under the cause and prejudice test must be something external to the petitioner, something that cannot fairly be attributed to him [;] ... some objective factor *external* to the defense [that] impeded ... efforts to comply with the State's procedural rule." *Maples v.*

*Stegall,* 340 F.3d 433, 438 (6th Cir. 2003)(quoting *Coleman v.*

*Thompson,* 501 U.S. at 753).  Petitioner has failed to meet this

standard here.  Nothing in the record indicates that any external

factor impeded Petitioner's ability to file a direct appeal.

Therefore, the fact that *res judicata* now bars his claims is

attributable only to him.

Beyond the four-part *Maupin* analysis, the Court is required to

consider whether this is "an extraordinary case, where a

constitutional violation has probably resulted in the conviction of

one who is actually innocent." *Murray v. Carrier,* 477 U.S. at 491;

*see also Sawyer v. Whitley,* 505 U.S. 333 (1992).

> [I]f a habeas petitioner "presents evidence of
> innocence so strong that a court cannot have
> confidence in the outcome of the trial unless the
> court is also satisfied that the trial was free of
> nonharmless constitutional error, the petitioner
> should be allowed to pass through the gateway and
> argue the merits of his underlying claims." *Schlup,*
> 513 U.S. at 316, 115 S.Ct. 851, 130 L.Ed.2d 808. Thus,
> the threshold inquiry is whether "new facts raise [ ]
> sufficient doubt about [the petitioner's] guilt to
> undermine confidence in the result of the trial." *Id*.
> at 317, 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808.
> To establish actual innocence, "a petitioner must show
> that it is more likely than not that no reasonable
> juror would have found petitioner guilty beyond a
> reasonable doubt." *Id*. at 327, 513 U.S. 298, 115 S.Ct.
> 851, 130 L.Ed.2d 808. The Court has noted that "actual
> innocence means factual innocence, not mere legal
> insufficiency." *Bousley v. United States*, 523 U.S.
> 614, 623, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998). "To
> be credible, such a claim requires petitioner to
> support his allegations of constitutional error with
> new reliable evidence-whether it be exculpatory
> scientific evidence, trustworthy eyewitness accounts,
> or critical physical evidence-that was not presented
> at trial." *Schlup*, 513 U.S. at 324, 115 S.Ct. 851, 130
> L.Ed.2d 808. The Court counseled however, that the
> actual innocence exception should "remain rare" and
> "only be applied in the 'extraordinary case.' " *Id*. at
> 321, 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808.

*Souter v. Jones,* 395 F.3d 577, 589 (6th Cir. 2005) (footnote omitted).
The record fails to reflect such circumstances here.  Petitioner
alleges no new facts related to his convictions for burglary,
tampering with evidence, and having a weapon while under disability.
He has therefore not presented a case of actual innocence.

> **B.    Sufficiency of the Evidence for the Aggravated Murder Conviction**

In claim one, Petitioner also alleges that the evidence was
constitutionally insufficient to sustain his aggravated murder
conviction.  In support, he asserts that the conviction was based on
the unreliable testimony of his co-defendant and two "jail house
snitches," *Petition*, PAGEID# 19, and that the only eyewitness to the
crime testified that the killer was wearing white tennis shoes while
Petitioner was wearing black tennis shoes.  Additionally, Petitioner
argues that, because his co-defendant testified that they entered the
residence to steal drugs and had no intention, at the time, of
committing murder, the evidence was insufficient to sustain a
conviction for aggravated murder.

The state appellate court rejected this claim in relevant part as
follows:

> Sufficiency of the evidence is a legal standard
> that tests whether the evidence introduced at
> trial is legally sufficient to support a verdict.
> *State v. Thompkins*, 78 Ohio St.3d 380, 386, 1997–
> Ohio-52. The test is a question of law. *Id*. The
> appellate court's function is to determine
> whether, when viewing the evidence in a light
> most favorable to the state, any rational trier
> of fact could have found that the state proved,
> beyond a reasonable doubt, all of the essential
> elements of the crime. *State v. Jenks* (1991), 61
> Ohio St.3d 259, paragraph two of the syllabus;

17

*State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, ¶ 78. The existence of conflicting evidence does not render the evidence insufficient as a matter of law. *State v. Murphy*, 91 Ohio St.3d 516, 543, 2001-Ohio-112. The trier of fact makes determinations of credibility and the weight to be given to the evidence. *State v. DeHass* (1967), 10 Ohio St.2d 230, paragraph one of the syllabus. A jury may believe or disbelieve all, part, or none of a witness' testimony. *State v. Antill* (1964), 176 Ohio St. 61, 67; *State v. Raver*, 10th Dist. No. 02AP-604, 2003-Ohio-958, ¶ 21.

\*\*\*

At the outset, we note that while appellant's statement of assignment of error lists each of his convictions (*i.e.,* aggravated murder, aggravated burglary, tampering with evidence, and having a weapon under disability), the argument set forth in the body of the first assignment of error only addresses the sufficiency and manifest weight of the evidence regarding his conviction for aggravated murder. Specifically, appellant argues that the element of prior calculation and design was lacking because Blevins testified that the intent of the burglary of Wood's home was to steal drugs and money, not to kill Wood. According to appellant, the testimony of Blevins indicates that appellant and Blevins entered the house and began searching for drugs, and that the return of Wood appeared to be a surprise; further, that appellant only began shooting at Wood after Wood confronted him in the basement. Appellant notes that another of the state's witnesses, Jones, observed an individual with white tennis shoes standing over his nephew, while the evidence indicates appellant was wearing black tennis shoes at the time of the incident.

R.C. 2903.01(A) states in part: "No person shall purposely, and with prior calculation and design, cause the death of another." Pursuant to R.C. 2901.22(A), "[a] person acts purposely when it is his specific intention to cause a certain result." Intent may be determined from the surrounding facts and circumstances. *State v. Johnson* (1978), 56 Ohio St.2d 35, 38. An intent to kill may be presumed where the natural and probable consequence of an act is to produce death and the jury may conclude from the

surrounding circumstances that there was an intention to kill. *State v. Robinson* (1954), 161 Ohio St. 213. It is presumed that a person intends the natural, reasonable, and probable consequences of his voluntary acts. *State v. Nabozny* (1978), 54 Ohio St.2d 195.

In *State v. Robbins* (1979), 58 Ohio St.2d 74, paragraph one of the syllabus, the Supreme Court of Ohio held:

> Where evidence adduced at trial reveals the presence of sufficient time and opportunity for the planning of an act of homicide to constitute prior calculation, and the circumstances surrounding the homicide show a scheme designed to implement the calculated decision to kill, a finding by the trier of fact of prior calculation and design is justified.

Prior calculation and design can be formed over a short time period. For example, in *Robbins*, the court upheld a finding of prior calculation and design where the defendant was the aggressor and had accosted the decedent in an apartment building hallway, knocking him to the floor. The defendant then went into his adjacent apartment, retrieved a long knife, and stabbed the victim to death "instants later." *Robbins* at 79.

In the present case, the state presented evidence indicating that appellant's uncle, Rudolph Lynch, had been charged with a serious drug offense, and that Wood had agreed to testify against him. Several days before the shooting, appellant, who had been living with his uncle, accompanied his uncle to Cleveland to pick up Blevins. Lynch then drove them to Columbus, where Lynch rented a motel room for the two men. The day prior to the shooting, Lynch drove appellant and Blevins to Wood's neighborhood, where they watched his house for approximately one hour. The next day, they returned and waited for Wood and his wife to leave the house and then entered it, searching for drugs and money. Blevins testified that he observed a .357 revolver in the van.

When Wood returned to his house, Blevins and appellant hid in the basement. Wood started down the stairs, but then noticed appellant. As Wood

ran upstairs, appellant chased after him and multiple shots were fired outside. Wood was heard saying, "[d]on't kill me" or "[n]o, man, no" before he was killed. (Tr. 291; 549.) Wood was shot five times, including three wounds to the back of the body (head, upper back and mid-back). The testimony by Jones was that the last two shots were fired at close range as the shooter was standing over Wood. (Tr. 293.) Appellant and Blevins fled the area after the shooting and disposed of a weapon, coats, gloves, and a mask. Appellant himself testified he told the police that he lied about his alibi being a girl named "Pebbles."

Blevins testified that appellant told him that Wood had agreed to testify against Lynch. Further, two jailhouse informants provided testimony about encounters with appellant following the shooting. Andre Brown testified that appellant told him that he and Blevins came to Columbus with his uncle, and that his uncle "had paid him to kill a dude so he wouldn't testify on him." Appellant expressed concern to Brown about gunshot residue on his clothing, and that he was worried his co-defendant would "tell on him." The other informant, Mason, similarly testified that appellant expressed concern about gunshot residue on his clothing.

Upon review, considering all of the facts and circumstances, including the number of shots fired and the location of the wounds on the victim's body, there was evidence upon which a reasonable trier of fact could have found that appellant made a calculated decision to kill Wood. Here, construing the evidence most strongly in favor of the state, there was sufficient evidence for the jury to have found that the state proved, beyond a reasonable doubt, the element of prior calculation and design necessary to convict appellant of aggravated murder.

In arguing that his conviction was against the manifest weight of the evidence, appellant challenges the credibility of the testimony of Blevins as well as the testimony of the "jailhouse informants." However, as noted by the state, Blevins' testimony was corroborated by other evidence. The state introduced evidence that a van was rented by Lynch's wife during the time surrounding the events. Cell phone records

indicated that appellant phoned Lynch shortly after the incident. Blevins testified that he threw a mask, gloves, and coat in the trash, where they were later recovered by police officers. Blevins also testified that appellant threw the weapon into a sewer, and officers recovered the weapon from that location. A Motel 6 employee testified that appellant appeared to be in charge, and that appellant kept trying to call his uncle. As to the credibility of Brown, one of the informants, the record reflects similarities between Blevins' version of the events and the testimony given by Brown. Further, it was within the province of the jury to believe or disbelieve Brown's testimony, including testimony that appellant stated his uncle "paid him to kill a dude so he wouldn't testify."

Upon review, giving deference to the jury's determinations regarding credibility, and having reviewed the entire record, we do not find that the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. Accordingly, the conviction is not against the manifest weight of the evidence. Finally, although appellant's assignment of error only addresses the conviction for aggravated murder, we further note that a review of the record indicates there was sufficient evidence to support appellant's remaining convictions, and that those convictions are similarly not against the manifest weight of the evidence.

Based upon the foregoing, appellant's . . . assignment of error is overruled.

*State v. Coleman*, 2011 WL 1483891, at *6-9.

The factual findings of the state appellate court are presumed to be correct:

In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

21

28 U.S.C. § 2254(e)(1). Further, a federal habeas court may not grant relief unless the state court's decision was contrary to or an unreasonable application of clearly established federal law, or based on an unreasonable determination of the facts in light of the evidence that was presented.

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). In order to obtain habeas corpus relief, a petitioner must show that the state court's decision was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Bobby v. Dixon*, -- U.S. --, 132 S.Ct. 26 (Nov. 7, 2011) (quoting *Harrington v. Richter*, 562 U.S. --, --, 131 S.Ct. 770, 786-87 (2011)). This bar is "difficult to meet" because "habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Harrington*, 131 S.Ct. at 786 (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n. 5 (1979) (Stevens, J., concurring in

judgment)).  In short, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."  *Id.* (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664, (2004)).

A state court's determination regarding a sufficiency of evidence claim is entitled a "double layer" of deference.  As explained in *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009), deference is due the jury's finding of guilt because the standard, announced in *Jackson v. Virginia*, is whether, "viewing the trial testimony and exhibits in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Even if *de novo* review of the evidence leads to the conclusion that no rational trier of fact could have so found, a federal habeas court "must still defer to the state appellate court's sufficiency determination as long as it is not unreasonable."  *See also White v. Steele*, 602 F.3d 707, 710 (6th Cir. 2009).  This is a substantial hurdle for a habeas petitioner to overcome, and for the reasons discussed by the state appellate court, Petitioner has failed to do so here.

## IV.  <u>The Right to Be Present at a Critical Stage of the Proceedings</u>

In claim two, Petitioner alleges that he was denied his right to be present during a critical stage of the proceedings.  This claims arises in connection with the jury's questions during deliberations; Petitioner alleges that "[n]othing in the record indicates that the Petitioner was present during the reading of the questions or even

knew of the exist[e]nce of the questions." *Traverse*, PAGEID# 369. The Court concludes that this claim is also barred by Petitioner's procedural default pursuant to the four-part *Maupin* analysis described above. 785 F.2d at 138

The first prong of the *Maupin* test is satisfied because Petitioner failed to comply with Ohio's contemporaneous objection rule. Although Petitioner properly raised this claim on direct appeal and on appeal to the Ohio Supreme Court, no objection was raised in the trial court at the time that the alleged error occurred. Ohio applies a contemporaneous objection rule to any error that could have been avoided or corrected by the trial court had a contemporaneous objection been made. *LeFort v. Century 21-Maitland Realty Co.*, 32 Ohio St.3d 121 (1987) ("An appellate court will not consider any error which a party complaining of a trial court's judgment could have called but did not call to the trial court's attention at a time when such error could have been avoided or corrected by the trial court.") (citations omitted). Under that rule, an appellant who fails to raise an objection to a trial court waives later review unless he can demonstrate "plain error." *Williams v. Bagley*, 380 F.3d 932, 968 (6th Cir. 2004). The state appellate court reviewed this claim for plain error:

> [A]ppellant contends that he was deprived of his right to be present and to have the presence and assistance of his counsel during a critical stage of his jury trial. Specifically, appellant argues there is nothing in the record indicating he was present during the reading of a question submitted to the jury during deliberations.
>
> A criminal defendant has a fundamental right to be present at all critical stages of his criminal trial.

Section 10, Article I, Ohio Constitution; Crim.R. 43(A); *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3246, ¶ 100. "An accused's absence, however, does not necessarily result in prejudicial or constitutional error." *State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, ¶ 90. " '[T]he presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only.' " *Id.*, quoting *Snyder v. Massachusetts* (1934), 291 U.S. 97, 107-08, 54 S.Ct. 330, 333, *overruled on other grounds Duncan v. Louisiana* (1968), 391 U.S. 145, 154, 88 S.Ct. 1444, 1450. Thus, a violation of Crim.R. 43(A), where the defendant is absent, although improper, can constitute harmless error where no prejudice is suffered. *State v. Williams* (1983), 6 Ohio St.3d 281, 286-87.

Although appellant did not argue such in his written brief, at oral argument his counsel argued that the error was structural in nature, requiring no showing of prejudice. Structural errors "defy harmless-error analysis and are cause for automatic reversal" without a showing that a substantial right has been affected. *State v. Perry,* 101 Ohio St.3d 118, 2004-Ohio-297, ¶ 16. A structural error is a " 'defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself.' " *State v. Hill*, 92 Ohio St.3d 191, 197, 2001-Ohio-141, quoting *Arizona v. Fulminante* (1991), 499 U.S. 279, 309, 111 S.Ct. 1246, 1265. "Such errors 'infect the entire trial process,' [*Brecht v. Abrahamson* (1993), 507 U.S. 619, 630, 113 S.Ct. 1710, 1717], and 'necessarily render a trial fundamentally unfair,' [ *Rose v. Clark* (1986), 478 U.S. 570, 577, 106 S.Ct. 3101, 3106]." *Hill*. "Put another way, these errors deprive defendants of 'basic protections' without which 'a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence * * * and no criminal punishment may be regarded as fundamentally fair.' " *Hill,* quoting *Rose v. Clark* (1986), 478 U.S. 570, 577-78, 106 S.Ct. 3101, 3106.

The Twelfth District and the Second District have held that failure to comply strictly with Crim.R. 43(A) is not a structural error. *See State v. Armas,* 12th Dist. No. CA2004-01-007, 2005-Ohio-2793, ¶ 27 ("Statutory or rule violations, even serious ones, will not sustain a structural-error analysis"); *State v. Vinzant*, 2d Dist. No. 18546, 2001-Ohio-7005. This court has previously recognized that a defendant's absence is not a structural error, and even if improper, can

constitute harmless error where no prejudice is suffered. *State v. Reed,* 10th Dist. No. 09AP-1164, 2010-Ohio-5819; *State v. Warren,* 10th Dist. No. 10AP-376, 2010-Ohio-5718.

In the present case, there was no objection made to the trial court, and we therefore review this assignment of error under a plain error analysis. Although generally a court will not consider alleged errors that were not brought to the attention of the trial court, Crim.R. 52(B) provides that the court may consider errors affecting substantial rights even though they were not brought to the attention of the trial court. "'Plain error is an obvious error * * * that affects a substantial right.'" *Yarbrough* at ¶ 108, quoting *State v. Keith,* 79 Ohio St.3d 514, 518, 1997-Ohio-367. An alleged error constitutes plain error only if the error is obvious and, but for the error, the outcome of the trial clearly would have been different. *Id.* "Notice of plain error is taken with utmost caution only under exceptional circumstances and only when necessary to prevent a manifest miscarriage of justice." *State v. Martin,* 10th Dist. No. 02AP-33, 2002-Ohio-4769, ¶ 28.

Appellant argues that the trial court's handling of the jury's question was improper since defense counsel was in Cleveland, and the record does not demonstrate that appellant was present during the reading of the question, or even informed of the existence of the question. Appellant contends that having counsel present to discuss a substantive question with his client is an important and critical juncture in the case.

The record demonstrates that, during deliberations, defense counsel requested permission to return to Cleveland. Counsel stated: "I have requested the assistance of a local attorney. * * * He is in court on Monday, and he is available." (Tr. 1329.) Counsel also stated that he had spoken with his client, and that "Mr. Coleman is in agreement and he understands that Mr. Ireland is now added on our team." (Tr. 1329.) Defense counsel also stated: "I explained to Mr. Coleman jury deliberation is not a critical state of the case. However, I'll be available by cell phone for any questions that the jury may have and I would partake fully in helping answer any questions they may have." (Tr. 1330.) The trial court then addressed appellant and inquired as to his understanding, and appellant indicated he was in agreement.

The jury question at issue, which occurred during deliberations on November 9, 2009, is as follows: "Does complicity apply to every part of every count of each indictment? For example, does complicity apply to the 'firearm specification'?" The trial court's response was, "Yes. Please see page 16 para 1 of your instructions." Next to this notation are the judge's initials. After the notation is written, "Agreed to by Liz Geraghty and Fred Crosby[2] at 1:45," and the bailiff's signature appears on the page.

The Supreme Court of Ohio has held that when a defendant's counsel is present via telephone and consulted concerning the answer to be given, any error regarding the defendant's absence is harmless error. *State v. Franklin*, 97 Ohio St.3d 1, 18, 2002-Ohio-5304, citing *State v. Taylor* (1997), 78 Ohio St.3d 15, 25.

Upon review, we conclude that appellant's presumed absence was harmless error. As noted above, the record reflects that, even though counsel was in Cleveland, counsel was consulted as to the jury's inquiry by telephone before an answer was given, and that counsel was in agreement with the answer provided to the jury. Here, the answer merely reinforced the earlier instruction, and appellant has not demonstrated prejudice or shown how his presence would have altered the trial court's response. Further, the answer was "innocuous," as in *Taylor* at 26 (trial court's answer to jury, without consulting defense counsel, was incorrect; however, question and answer were innocuous, and therefore judge's brief answer was harmless).

Appellant cites *State v. Wade*, 10th Dist. No. 03AP-774, 2004-Ohio-3974, and *State v. Sales*, 10th Dist. No. 02AP-175, 2002-Ohio-6563, as supporting his argument that his presence was required. Those cases, however, are distinguishable from the facts of this case because, in both of those cases, the record was unclear whether the defendant or counsel was present during the preparation of the answers to the questions. In the instant case, appellant waived his counsel's physical presence, but counsel was consulted by telephone and approved the answer given to the jury. Given these facts, we cannot say that the trial court's procedure was other than harmless error.

---

[2] Mr. Crosby was Petitioner's trial counsel. *Petition*, PAGEID# 12.

*State v. Coleman*, 2011 WL 1483891, at *9-12.

The state appellate court explicitly relied on Petitioner's failure to contemporaneously object to the alleged error and thus engaged in a plain error review.  The appellate court also found that Petitioner's counsel was consulted by telephone, and thus any error was harmless.  The state court's alternative ruling on the merits does not forgive the procedural default or otherwise revive the claim for purposes of habeas corpus review*. See Harris v. Reed*, 489 U.S. 255, 264 n. 10 (1989) ("a state court need not fear reaching the merits of a federal claim in an alternative holding"); *Bowling v. Parker*, 344 F.3d 487, 498 (6th Cir. 2003) (where state court's dismissal of claim on merits constitutes an alternative holding, federal habeas court will consider the claim procedurally defaulted); *Kenney v. Haviland*, No. 1:04 CV 2194, 2006 WL 2792171, at *6 n. 8 (N.D. Ohio Sep.26, 2006) ("The mere existence of the clear statement rule confirms that an alternative holding on the merits cannot save a claim where the court clearly and expressly enforces a state procedural bar").  The first prong of the *Maupin* test has thus been satisfied.

Under the *Maupin* test, the Court must next determine whether the state courts actually enforced the state procedural rule.  "In determining whether state courts have relied on a procedural rule to bar review of a claim, we look to the last reasoned opinion of the state courts and presume that later courts enforced the bar instead of rejecting the defaulted claim on its merits."  *Hinkle v. Randle*, 271 F.3d 239, 244 (6th Cir. 2001).  Here, the state appellate court, which issued the last reasoned opinion reviewing petitioner's claim, applied

a plain error analysis. Moreover, the Sixth Circuit routinely holds that plain error review by a state appellate court constitutes enforcement of Ohio's contemporaneous objection rule. *Williams*, 380 F.3d 968-69 (citing examples).

Third, it must be decided whether the state procedural forfeiture is an adequate and independent state ground upon which the state can rely to foreclose review of a federal constitutional claim. In *Hinkle v. Randle*, the United States Court of Appeals for the Sixth Circuit held that a claim for prosecutorial misconduct claim involving the prosecutor's statements in closing argument was procedurally defaulted because a contemporaneous objection had not been raised. 271 F.3d at 244. "We have held that Ohio's contemporaneous objection rule constitutes an adequate and independent state ground that bars federal habeas review absent a showing of cause and prejudice." 271 F.3d at 244. Similarly, in *Williams v. Bagley*, the Sixth Circuit applied the contemporaneous objection rule to petitioner's failure to object to a prosecutor's improper vouching for the credibility of the petitioner's accomplices during their testimony. 380 F.3d 968-69. This prong of the *Maupin* test has also been met.

The final prong of the *Maupin* analysis permits review of the merits of an otherwise defaulted claim if the petitioner establishes cause for his procedural default and actual prejudice from the alleged constitutional violation. In this context, Petitioner must demonstrate that something external to his defense impeded his ability to comply with the state procedural rule. *See Coleman*, 501 U.S. 753; *Maples,*

340 F.3d at 438.  Petitioner has failed to meet this standard here.[3]
Nor is this "an extraordinary case, where a constitutional violation
has probably resulted in the conviction of one who is actually
innocent." *Murray v. Carrier*, 477 U.S. at 491; *see also Sawyer v.
Whitley*, 505 U.S. 333.  Petitioner alleges no new evidence that raises
doubts sufficient to undermine confidence in the results of the trial.
Indeed, Petitioner raises no new facts at all.

**V.**     **The Imposition of Consecutive Sentences**

    In claim three, Petitioner alleges that the trial court erred by
imposing consecutive sentences without making the requisite factual
findings.  The state appellate court rejected this claim as follows:

> [A]ppellant contends that the trial court erred by
> imposing consecutive sentences without making
> requisite factual findings, thereby depriving him of
> due process of law. Appellant notes that, in *State v.
> Foster*, 109 Ohio St.3d 1, 2006-Ohio-856, the Supreme
> Court of Ohio found R.C. 2929.14(E)(4)
> unconstitutional and severed that statutory provision,
> leaving trial courts with the discretion to impose
> consecutive sentences without the need for factual
> findings. Appellant argues that *Oregon v. Ice* (2009),
> 555 U.S. 160, 129 S.Ct. 711, has in effect revived
> R.C. 2929.14(E)(4).
>
> Subsequent to the time for filing briefs in this case,
> the court rendered its decision in *State v. Hodge*, 128
> Ohio St.3d 1, 2010-Ohio-6320, in which the court
> addressed this issue and held that *Ice* does not revive
> R.C. 2929.14(E)(4).  Specifically, in *Hodge* at
> paragraph two of the syllabus, the court held in part:
> "The United States Supreme Court's decision in *Oregon*

---

[3] Petitioner does not allege that his trial counsel should have objected and
that his counsel's failure to do so constituted ineffective assistance.
Moreover, Petitioner has never presented such a claim to the state courts,
and it does not appear that he could at this point present such a claim. Any
procedural default can therefore not be excused by the failure of
Petitioner's counsel to complain to the trial court of the alleged error.
*See Edwards v. Carpenter*, 529 U.S. 446, 451-52 (2000) (ineffective assistance
of counsel cannot constitute cause for a procedural default where that claim
has itself been procedurally defaulted).

*v. Ice* * * * does not revive Ohio's former consecutive-sentencing statutory provisions, R.C. 2929.14(E)(4) and 2929.41(A), which were held unconstitutional in *State v. Foster*." Accordingly, because trial judges are not obligated to engage in judicial fact-finding prior to imposing consecutive sentences, appellant's third assignment of error is without merit and is overruled.

*State v. Coleman*, 2011 WL 1483891, at *12.

This claim plainly fails. As this Court has previously explained:

[T]he Ohio Supreme Court had ruled in *State v. Foster*, 109 Ohio St.3d 1, 845 N.E.2d 470 (Ohio 2006), that portions of Ohio's sentencing statutes, including the provision requiring the trial judge to make certain findings before imposing consecutive sentences, violated the defendant's Sixth Amendment right to a jury trial under the Supreme Court's decision in *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004). To remedy the constitutional defects, the *Foster* court severed the unconstitutional provisions and held, among other things, that the trial court had "full discretion" to impose consecutive prison terms without making findings or giving reasons for its decision. *Foster*, 845 N.E.2d at 497-99. Nearly three years later, in *Ice*, the Supreme Court upheld the constitutionality of Oregon's sentencing statute, which like Ohio's pre-*Foster* statute, required the trial judge to make factual findings prior to imposing consecutive sentences. In so ruling, the Court reasoned that the imposition of consecutive sentences does not implicate constitutional concerns under the Sixth Amendment. *See Ice,* 555 U.S. at 167-69.

*Scott v. Warden,* No.1:12-cv-118, 2013 WL 2096641, at *5 (S.D. Ohio May 14, 2013).

Simply put, *Oregon v. Ice* does not support Petitioner's claim that his constitutional rights were violated or that he is entitled to federal habeas relief on his third claim.

Although the Supreme Court in *Oregon v. Ice* allowed Oregon and other states to require additional judicial factfinding before imposing consecutive sentences, it did not require states (or Ohio specifically) to allow the imposition of consecutive sentences only when the

31

sentencing judge finds additional predicate facts.
Oregon and other states remained free, after *Oregon v.
Ice*, to choose — or not choose — to impose consecutive
sentences only after finding certain predicate facts.
Neither sentencing choice runs afoul of *Blakely* or the
Sixth and Fourteenth Amendments. . . .

The Supreme Court explained:

> Most States continue the common-law
> tradition: They entrust to judges'
> unfettered discretion the decision whether
> sentences for discrete offenses shall be
> served consecutively or concurrently. In
> some States, sentences for multiple
> offenses are presumed to run consecutively,
> but sentencing judges may order concurrent
> sentences upon finding cause therefor.

*Oregon v. Ice*, 555 U.S. at 163-64, 129 S.Ct. at 714.
*Oregon v. Ice* did not invalidate the common-law
tradition of extending "unfettered discretion" to
judges in states that allow judges to impose multiple
consecutive sentences without additional predicate
factfinding. As a result, the imposition of
consecutive sentences . . . without judicial predicate
factfinding does not conflict with *Oregon v. Ice* or
the Constitution. *See id.*, 555 U.S. at 164-72, 129
S.Ct. at 714-19.

*Handcock v. Warden,* No. 3:12-cv-00096, 2014 WL 223649, at *8-9 (S.D.

Ohio Jan. 21, 2014). Claim three is thus without merit.

**WHEREUPON,** the Magistrate Judge **RECOMMENDS** that this action be

**DISMISSED.**

## VI.  Procedure on Objections

If any party objects to this *Report and Recommendation*, that

party may, within fourteen (14) days of the date of this report, file

and serve on all parties written objections to those specific proposed

findings or recommendations to which objection is made, together with

supporting authority for the objection(s). A judge of this Court

shall make a *de novo* determination of those portions of the report or

specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to have the district judge review the *Report and Recommendation de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the *Report and Recommendation.* *See Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir.1981).

The parties are further advised that, if they intend to file an appeal of any adverse decision, they may submit arguments in any objections filed, regarding whether a certificate of appealability should issue.

Date: May 2, 2014                          *s/  Norah McCann King*
                                    _____
                                    Norah McCann King
                                    United States Magistrate Judge